# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 4:11-cr-0062** |
| v. | : | **(Judge Conner)** |
| **JEREMY T. BRASHEAR** | : | |

## MEMORANDUM

Presently before the court is defendant Jeremy T. Brashear's ("Brashear") motion to suppress. (Doc. 51). The court held an evidentiary hearing on the motion on September 20, 2012. The parties have fully briefed the issues, and the motion is ripe for disposition. For the reasons that follow, the court will deny Brashear's motion.

## I. Findings of Fact[1]

In late 2010, Trooper Matt Powell of the Pennsylvania State Police advised Corporal Thomas Trusal that he had uncovered evidence of child pornography originating from the IP address 174.60.89.228.[2] (Doc. 68, Suppression Hearing Transcript, Sept. 20, 2012, at 6:3-10). Comcast Cable Communications ("Comcast")

---

[1]These findings of fact are based on documentary and testimonial evidence presented at the September 20, 2012 hearing. Both Brashear and the investigating law enforcement officers testified.

[2]Trooper Powell had been conducting an internet investigation of file sharing programs which may have contained child pornography. During the course of his investigation, Trooper Powell downloaded two videos from this IP address which contained child pornography. In addition, Trooper Powell identified numerous files associated with child pornography emanating from the same IP address. (Id. at 8:24).

controlled the subject IP address. (Id. at 7:12-15). Accordingly, Corporal Trusal obtained a subpoena to retrieve from Comcast the subscriber and billing information for this IP address. (Id. at 14:23-24). Based upon an aggregate of investigative materials, including the identification of the registered account holder,[3] Corporal Trusal secured a search warrant for 1651 Kaiser Avenue, South Williamsport, Pennsylvania, 17702. (Id.)

On December 16, 2010, shortly after 10 a.m., Corporal Trusal, along with Special Agent Scott Earl from the Federal Bureau of Investigation, Trooper Mike Gownley, and South Williamsport Police Department Detective James Taylor and Officer Devin Thompson, arrived at the Kaiser Avenue residence to execute the search warrant. (Id. at 15:9, 19, 25, 16:1, 2, 5). Doris Wachter, her son E.W., and another individual, R.H., were located in the residence. (Id. at 19:3-5). Corporal Trusal explained who he was and why he was there while the other officers conducted a brief security sweep to account for all of the occupants of the residence. (Id. 19:9-11). The residents advised Trusal that the property contained several computers, but they insisted that no one had downloaded female child pornography onto those computers. (Id. at 19:19). They provided Trusel with a reasonable explanation for their adamant denial of child pornography which involved the sexual orientation of the computer operators. (Id. at 19:25). Thereafter, E.W. informed Trusel that defendant Jeremy Brashear, an employee of

---

[3]The account was registered to a Doris Wachter. (Gov't Ex. 10).

2

his child entertainment business, lived in a trailer on his property, owned a laptop which he frequently utilized, and had access and permission to use the household's wireless internet. (Id. at 20:8-15). Trusal immediately advised his fellow officers that there may be an additional resident living in a trailer behind the house and that this individual may possess computer equipment. (Id. at 20:23-25). The officers, believing the place to be secure and assuming all residents had been accounted for, had left their mobile forensic vehicle ("mobile unit") and squad cars unlocked. (Id. at 119:2-4). Significantly, over one-half hour passed before the officers were alerted to the presence of this additional individual who purportedly resided on the premises. (Id. at 118:24-25).

Special Agent Earl, Trooper Gownley, and Detective Taylor immediately left the residence to locate the trailer and to determine whether Brashear was occupying it. (Id. at 42:19). When they arrived at the trailer, Detective Taylor knocked but received no response. Detective Taylor knocked again, louder, and heard a male voice but no one came to the door. Eventually, after repeated knocking, Brashear answered. (Id. at 42:24-25, 43:1, 89:17-24). Detective Taylor advised Brashear to step outside while Taylor walked inside the trailer to make certain that no one else was present. (Id. at 43:9, 14). Because the trailer was so small, this security sweep lasted only a few seconds.[4] (Id. at 43:16-17). From his

---

[4]From the testimony and images provided the court, the trailer would best be described as a one room camper, approximately fifteen to twenty square feet in area.

3

vantage point at the front door, Trooper Gownley observed a laptop computer sitting on a table. (Id. at 44:8-9). When Brashear exited the trailer he wore sweatpants, a sweatshirt, and some form of footwear. (Id. at 44:19-21, 125:8-9). Due to the extremely cold weather conditions that day, Detective Taylor returned to the trailer shortly thereafter to provide Brashear with a cold weather jacket.[5] (Id. at 44:18).

Trooper Gownley explained to Brashear who the officers were and why they were there. (Id. at 45:12-18). He explained that they were investigating information involving the possible downloading of child pornography to the IP address associated with the wireless connection at the Wachter residence. (Id. at 45:16). Trooper Gownley asked Brashear who he was and why he was there, information which Brashear provided. (Id. 46:2-3). Due to the cold weather, Trooper Gownley asked Brashear if he would be willing to step into the heated mobile unit.[6] (Id. 46:14-18). Brashear agreed and proceeded into the mobile unit with Trooper

---

[5]In light of the weather conditions, the officers provided Brashear with boots from his trailer. The officers assert that they gave these boots to Brashear a short time later, while Brashear argues that it was several hours later. (Id. at 44:19, 70:5, 126:17-22). The court finds it unnecessary to resolve this factual dispute as there is no evidence that Brashear complained of inadequate footwear.

[6]The owners of the residence apparently objected to the use of their residence for purposes of interviewing Mr. Brashear. Brashear's trailer did not have heat. Trooper Gownley concluded that the mobile unit would be a better atmosphere than a squad car for his discussion with Brashearm particularly in light of the fact that Mr. Brashear was not yet a suspect. (Id. at 25:2, 85:6).

4

Gownley and Detective Taylor.[7] (Id. at 46:19). The mobile unit had two chairs and Trooper Gownley and Brashear both sat down. (Id. 46:24-25, 47:1). Because of space limitations, Detective Taylor stood in a corner of the van near the back door. which caused him to be situated behind Brashear. (Id. 64:15, 93:1-4). According to Detective Taylor, Taylor explicitly advised Brashear that he was not trying to impede Brashear from exiting the van should Brashear feel as though he no longer wished to remain in the vehicle.[8] (Id. 96:3-9). Both officers testified credibly that they advised Brashear he was free to leave at any time. (Id. at 74:1, 77:24, 96:1, 96:9, 96:12).

Gownley asked Brashear for his full name, his social security number, his place of employment, his address, and the length of time he had resided at that address. (Id. at 47:3-5). Gownley did not provide Brashear with Miranda warnings because Brashear was not in custody and Gownley sought only biographical and background information in the typical fashion of an initial encounter, see United States v. Valentine, 232 F.3d 350, 356 (3d Cir. 2000) (acknowledging that "it is well established that officers are allowed to ask questions of anyone [] without having any evidence creating suspicion."). (Id. 47:6-10). Trooper Gownley reiterated to

---

[7]The mobile investigation unit is approximately fifteen to seventeen feet long with a desk along one edge, space to stand in the middle and shelving along the opposite side. Trooper Gownley testified that it most resembles an ambulance. (Id. at 7-8). Notably, Brashear's one room trailer is about the same size.

[8]The presence of two officers is standard procedure when questioning individuals. This ensures that later accounts of what took place during officer-citizen interactions are corroborated and reliable.

5

Brashear that he was involved in an investigation into child pornography. (Id. 45:12-18). Gownley explained to Brashear that a computer operator was using a file share program to receive, store, and disseminate child pornography and that the subject computer was linked to the IP address assigned to the Kaiser Avenue residence. (Id. 45:16). In response, Brashear volunteered that he had a laptop, accessed the internet using the Wachter's unsecured wireless, and used file share programs. (Id. at 47:16-19). Brashear also volunteered that when he was searching for images of the celebrity Daisy Fuentes, he inadvertently happened upon a picture of a nude thirteen year-old girl. (Id. at 48:15-17). Trooper Gownley asked Brashear for consent to search Brashear's computer, but Brashear did not respond directly to Trooper Gownley's requested; instead, Brashear voiced concern about what might be found in his temporary files folder. (Id. at 48:21-25).

At this juncture, Gownley abruptly stopped the interview, because Brashear was now a suspect. (Id. at 49:4-8). Brashear asked if he could smoke and stepped outside with Detective Taylor. (Id. at 49:14, 108:10-13). During this smoke break, Trooper Gownley went to the house to inform Corporal Trusal of the status of his discussions with Brashear. (Id. at 49:15). Corporal Trusal advised Gownley that an initial search of the household computers revealed no evidence of child pornography. (Id. at 49:20-21).

Gownley, Taylor, and Brashear returned to the heated mobile unit. Before proceeding any further with the interview, Gownley read Brashear his Miranda warnings. (Id. at 51:1-2). Gownley informed Brashear that he was not under arrest,

6

and that he was free to leave and free to not answer any questions. (Id. at 51:11-16). Brashear remained seated and did not seek to leave the mobile unit. (Id. at 51-17-18). Gownley asked Brashear for consent to audiotape their conversation, and Brashear agreed. (Id. at 51:20-22).

The recorded conversation can be summarized as follows: Brashear states that he is a thirty-eight year old male, originally from Biloxi, Mississippi, but currently residing in the trailer on E.W.'s property. (Id.) Brashear is employed by E.W. at Puppet Master Productions, and he performs sporadically as a puppeteer. (Id.) He states he has lived in Pennsylvania approximately a year and a half and has been living on the property since August 2010. (Id.) Brashear confirms that he has been read his Miranda rights and voluntarily waives them with his signature. (Id.) Brashear acknowledges that he is concerned about child pornography in his temporary files, *to wit*, the picture of the thirteen year-old female mentioned *supra*. (Id.) He further explains that, based on his work experience at various carnivals, he is able to identify different age ranges of children. (Id.) Brashear further explained that he has a penchant for "small breasted women" and "delicate chests" and, therefore, when searching for such depictions he would occasionally stumble across images of girls who looked under eighteen and that he would immediately delete these images. (Id.) When further questioned regarding files that would "pop up" or accidentally get downloaded using file share programs, the following exchange took place:

7

Gownley: Ok, right, so you start the process, right? So you look at the file name, right? So if you look, if I'm looking for a song, I type in the song, you know, whatever, what's the name of a song?

Brashear: I usually look up by artists like you pull up—

Gownley: Alright well I only listen to talk radio so I don't even know a name of one artist.

Brashear: You put in Weird Al and you're going to get purities from everybody out there, from Jonathan Coltron to um, who's the guy that does the Christmas stuff? Bob Rivers. And anything that's superiority gets contributed to Weird Al now.

Gownley: Well—

Brashear: It's a hazard of people sharing stuff that they don't really pay attention to what they're doing. They just, well this seems like this so—

Gownley: So is that what you do? Like you type in something and then you look at the file name and say oh, this looks like something I would want and download it and then view it? Is that right?

Brashear: Typically.

Gownley: Ok so if you put in a search for Weird Al, and up popped up 3YO Young Girl Gets Raped by Daddy, that's the file name, you would never click on that and download that.

Brashear: No that would be obviously uh not what you are looking.

Gownley: Right so you would never do that. You never did that. You never looked at a file name, of the file names, so I guess what I'm getting at is every file name on your computer should, if it contains child pornography, it should say something else. It should be like uh, Weird Al song or you know a famous actress that you were looking for in the nude or some adult porn star in the nude. Not having a name like child porn that would alert to child pornography that you could just look at the file name and tell oh this could possible be child pornography.

Brashear: Can you pick up the tape recorder for a moment please.

> Gownley: I, I am sorry, could you speak up? Just, are you asking me to stop the tape?
>
> Brashear: For a moment please.
>
> Gownley: Ok, I'll stop the tape. It's uh 11:47 a.m.

(Id.) At this point the tape is stopped and Brashear asks to use the bathroom. (Doc. 68, at 53:11-12). He is escorted to the house by Detective Taylor, and while in the house is monitored by another police officer. (Id. 78:25, 79:1). When Brashear returned from the bathroom, he told Trooper Gownley that he had child porn on his computer. (Id. at 54:4). Brashear then agreed to continue with the recorded interview. (Id. at 54:14, 17). At 12:19 p.m. the recorded interview resumed. (Gov't Ex. 13.1). Brashear admitted to downloading child pornography using file share programs. (Id.) Brashear stated that in addition to the laptop, there was a broken hard drive and thumbdrive in the trailer.[9] (Id.) The officers advised Brashear that they were obtaining a search warrant for the trailer. (Id.) Brashear stated he was not under the influence of alcohol[10] or any prescription or non-prescription

---

[9] A thumbdrive belonging to Brashear was also located in a backpack in the Kaiser Avenue main residence.

[10] Brashear now claims that he had been drinking the night before the police arrived at his trailer and that he was still feeling the effects of a late night binge during his interview with Trooper Gownley. The court does not find this testimony credible for the following reasons. First, during the interview, Brashear expressly states that he is not under the influence of alcohol. Second, the entire audiotape was played during the suppression hearing and the court did not detect any evidence of confusion or slurred speech on the part of Brashear. Third, the investigating officers testified credibly that they did not observe any telltale signs of alcohol in Brashear's conduct, such as, stumbling, lack of coordination, bloodshot or glassy eyes, etc.

narcotics and that he had been treated "fairly well" by the officers. (Id.) The recorded interview ends at 12:45 p.m. (Id.) The court notes that the audio recording reveals Brashear to be a well-spoken, intelligent individual who did not slur his speech, sound confused, or disoriented, or in any way convey that he was unable to answer the questions posed to him. Brashear did not ask to leave, or ask that the questioning cease except for the occasion when he requested to use the bathroom.

The government concedes that once the interview concluded, Brashear was not free to leave. The officers eventually secured a search warrant for Brashear's trailer and laptop which revealed child pornography. (Id. at 113:4-6).

Brashear asserts the following: (1) he claims that the officers' conduct clearly indicated that he was not free to leave (id. at 129:9-10); for example, when the officers first extricated him from his trailer he was told to stay where they could see him (id. at 129:15-16); (2) Trooper Gownley informed him that everything would be okay if Brashear gave the officers the answers they wanted (id. at 131:19-21); for example, he perceived a very hostile environment accented by Trooper Gownley puffing his chest and at one point showing his fist in such a way that Detective Taylor could not see the threat (id. at 140:16-25, 141:1); by way of further example, he also claims that one can hear Trooper Gownley raise his voice and become increasingly irritated on the audio recording (id. at 15-17).

## II. **Discussion**

Brashear asks this court to suppress the evidence found in the trailer because it was secured through an improper search warrant based on statements that he made to officers while he was intimidated and under the influence of alcohol. The government posits that the initial entry into Brashear's trailer was merely a "safety sweep," and the subsequent search of the trailer was based on a second valid search warrant. Furthermore, the government asserts that all questioning of Brashear was proper.

The Fourth Amendment to the United States Constitution protects citizens from unreasonable searches and seizures. See U.S. Const. Amend. IV; Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); United States v. Kim, 27 F.3d 947, 950 (3d Cir. 1994). The Fourth Amendment requires that officers conducting searches must have reasonable suspicion that criminal activity is afoot. United States v. Ubiles, 224 F.3d 214, 217 (3d Cir. 2000). Courts determine whether reasonable suspicion exists by examining the totality of the circumstances. Whren v. United States, 517 U.S. 806, 810 (1996); Delaware v. Prouse, 440 U.S. 648, 654 (1979); Terry v. Ohio, 392 U.S. 1, 21-22 (1968).

However, the Supreme Court has clarified that a Fourth Amendment seizure does not occur simply because an officer interacts with a citizen. United States v. Crandall, 554 F.3d 79, 85 (3d Cir. 2009). Encounters between officers and citizens that are casual are deemed "consensual" because the citizen has the power, at any time, to continue or end the interaction. Id. Casual consensual encounters only

amount to Fourth Amendment seizures when an officer, "by means of physical force or show of authority, has in some way restrained the liberty of the citizen." Id. (citing Terry v. Ohio, 392 U.S. at 19-20). "The 'show of authority' test 'is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person' in light of all the surrounding circumstances." Id. (citing California v. Hodari D., 499 U.S. 621, 628 (1991).

Here, the interaction between officers and Brashear was a voluntary and consensual encounter that progressed into an investigatory detention based upon reasonable suspicion. It is important to note that Brashear does *not* dispute the legality of the initial search of the Wachter residence based upon evidence that someone was using the residence's IP address to download and disseminate child pornography. There is also no dispute that the officers' conduct in the Wachter residence was reasonable and appropriate. When, in the course of executing the search warrant, officers learned that another individual resided on the property, it was entirely reasonable and appropriate for the officers to approach the trailer to ascertain Brashear's identity and to make further inquires into his status on the property. See United States v. Henderson, 123 F. App'x 459, 463 (3d Cir. 2005) ("Police do not violate the Fourth Amendment by merely approaching an individual and asking him questions."); Valentine, *supra*, p. 5. Furthermore, Detective Taylor's brief glance through the trailer to identify anyone else present on the property, which only lasted seconds, was reasonable. The court notes that officers

were surprised to learn, *one-half hour after presentation of the search warrant*, that one or more additional persons were residing on the property. Based upon these unique facts, the court finds that it was a reasonable security measure for the officers to identify all individuals on the property. Moreover, Trooper Gownley's observation of a laptop in the trailer was not based upon a search of the premises. To the contrary, the laptop was open and obvious to anyone standing at the front entrance. See United States v. Butler, 405 F. App'x 652, 656 (3d Cir. 2010) (when the police come on to private property to conduct an investigation or for some other legitimate purpose and restrict their movements to places visitors could be expected to go (*e.g.,* walkways, driveways, porches), observations made from such vantage points are not covered by the Fourth Amendment." (Internal citation omitted).

The court also finds the questioning in the mobile unit proper. The inclement weather conditions made inquiries outside unreasonable for both Brashear and the officers. Brashear acknowledges that his trailer was not heated, and the property owners did not want Brashear in the residence. This left the mobile unit as the only heated location for the parties to utilize to further their discussion. The officers did not command Brashear to enter the mobile unit. He was specifically and clearly advised, on multiple occasions, that he was free to leave at any time and police officers secured an appropriate winter coat for Brashear to enable him to exit the vehicle should he desire. There is no evidence the officers displayed their weapons, in fact, some of the officers were not even in uniform. See

13

Henderson, *supra,* at 464 (finding facts were insufficient to establish a "show of authority" where officer kept his hand on a holstered gun, made no demands of defendants besides asking him for identification, did not attempt to touch defendant, and officer did not inform defendant he would be detained or that he was not free to leave.)

The placement of the officers in the van was based on the van's interior design and the standard procedure of having two officers present during questioning. The placement of Detective Taylor by the door was ameliorated by Detective Taylor and Trooper Gownley advising Brashear that he was free to go and Detective Taylor's statement that his placement by the door should in no way be construed as an attempt to prevent Brashear from leaving.

Brashear told officers during this initial encounter that he had seen an image of what he perceived to be a nude thirteen year-old girl on this computer, and that he was nervous about what might be in his temporary files folder. There is no credible evidence that this statement was not voluntarily made. United States v. Naranjo, 426 F.3d 221, 227 (explaining that pre-custodial statements must be made voluntarily. "Voluntariness" for Miranda purposes "encompasses all interrogation practices likely to pressure a suspect to such an extend that he/she is precluded from making a free and rational decision about abandoning the protections of the Constitution and giving statements to police . . . . The inquiry [] focuses on whether the rights were knowingly and intelligently waived.") Prior to the time of his voluntary statement, Brashear was not in custody and was not a suspect.

Therefore, the officers were not obligated to advise him of his Miranda rights. Brashear's statement that he had seen an image of a pre-pubescent female on his computer, coupled with Trooper Gownley's observation of a laptop computer in the trailer, and the information provided by Trusel that there appeared to be no evidence of child pornography in the residence, raised reasonable suspicion of criminal activity triggering Miranda. Quite properly, Trooper Gownley terminated the interview until he could advise Brashear of his Miranda rights. Under these facts, there is no basis for suppressing the subsequent statements he made or the evidence obtained thereafter. See United States v. DeSumma, 272 F.3d 176, 180 (3d Cir. 2001) (holding "that the fruit of the poisonous tree doctrine does not apply to derivative evidence secured as a result of a voluntary statement obtained before Miranda warnings were issued.").

Clearly, Brashear's questioning turned from a mere encounter to an investigatory detention and Trooper Gownley timely read the Miranda warning form to Brashear. Thereafter, Brashear agreed to additional questioning, and further agreed to have the conversation recorded. This recording is perhaps the death knell to Brashear's argument for suppression, namely, that he was intoxicated, incoherent, and intimidated by the behavior of Trooper Gownley. Nothing in the recording provides any support for these contentions. Brashear sounds cooperative and coherent. His words are not slurred nor does he sound confused. To the contrary, he is well-spoken and highly literate. Furthermore, the recording reflects Trooper Gownley's demeanor to be, at all times, cordial and

appropriate whenever he addressed Brashear. Trooper Gownley was neither hostile nor aggressive.[11] Simply put, the court, upon reviewing both the demeanor of the officers on the stand and the audio recording, finds nothing incredible in their testimony. In contrast, Brashear's testimony on the stand directly belies the contents of the audio recording. As such, the court finds that Brashear's testimony regarding the events that took place on December 16, 2010, is not credible and that the evidence found should not be suppressed. The initial interaction between officers and Brashear was a casual, consensual encounter. Detective Taylor's brief glance through Brashear's trailer to establish that no other individuals were present was reasonable based on the confusion surrounding who resided on the property. Brashear's encounter with officers turned into an investigatory detention based on Brashear's voluntary statement and the status of the execution of the search warrant at the Kaiser Avenue residence. Brashear was properly and timely Mirandized. The court finds the officers' testimony to be credible and reliable, and Brashear's to be in contradiction with the audio recording of his interview. Hence, the motion will be denied.

---

[11]Furthermore, consistent with the recording, Trooper Gownley testified on rebuttal that in his investigative experience he feels he gets more information from suspects using "sugar" over "vinegar." (Hr'g Tr. at 164:19-20).

**III. <u>Conclusion</u>**

      For the aforementioned reasons, the court will deny the motion to suppress.

An appropriate order will issue.


                                                    <u>S/ Christopher C. Conner</u>
                                                    CHRISTOPHER C. CONNER
                                                    United States District Judge


Date:        October 12, 2012

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 4:11-cr-0062** |
| | : | |
| v. | : | (Judge Conner) |
| | : | |
| **JEREMY T. BRASHEAR** | : | |
| | : | |
| | : | |

# **ORDER**

AND NOW, this 12th day of October, 2012, upon consideration of defendant Jeremy T. Brashear's motion to suppress evidence (Doc. 51), and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that the motion (Doc. 51) is DENIED.

        S/ Christopher C. Conner
        CHRISTOPHER C. CONNER
        United States District Judge